1  **REICH RADCLIFFE & HOOVER LLP**
   Marc G. Reich (SBN 159936)
2  mgr@reichradcliffe.com
   Adam T. Hoover (SBN 243226)
3  adhoover@reichradcliffe.com
   4675 MacArthur Court, Suite 550
4  Newport Beach, CA 92660
   Phone:  (949) 975-0512
5  Fax: (949) 208-2839

6  **LIFSHITZ LAW PLLC**
   Joshua M. Lifshitz (*Pro Hac Vice to be submitted*)
7  jlifshitz@lifshitzlaw.com
   1190 Broadway
8  Hewlett, NY 11557
   Phone: (516) 493-9780
9  Fax: (516) 280-7376

10 Attorneys for Plaintiff

11             UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13

14 TRAVIS WILLS, Derivatively on Behalf of          Case No: 3:25-cv-03396
   Nominal Defendant GERON CORPORATION,

15              Plaintiff,

16 v.                                               **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

17 JOHN A. SCARLETT, ANDREW J.
   GRETHLEIN, MICHELLE J. ROBERTSON,              **Demand for Jury Trial**
18 FAYE FELLER, ANIL KAPUR, JAMES
   ZIEGLER, DAWN C. BIR, GAURAV
19 AGGARWAL, V. BRYAN LAWLIS, JOHN F.
   MCDONALD, SUSAN M. MOLINEAUX,
20 ELIZABETH G. O'FARRELL, and ROBERT J.
   SPIEGEL,

21              Defendants,

22 and,

23 GERON CORPORATION,

24              Nominal Defendant.

25

26

27

28

By and through his undersigned counsel, Plaintiff Travis Wills ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Geron Corporation ("Geron" or the "Company") and against certain current and former officers and directors of the Company for (i) violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duty; (iii) unjust enrichment; (iv) abuse of control; (v) gross mismanagement; and (vi) insider selling and misappropriation of information. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself/herself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Geron and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Geron's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Dabestani. v. Geron Corporation, et al.*, Case No. 25-cv-02507 (N.D. Cal.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Geron and the Defendants.

## NATURE OF THE ACTION

1.      Plaintiff brings this action derivatively for the benefit of Nominal Defendant Geron against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately February 28, 2024, to the present (the "Relevant Period").[1]

2.      Defendants provided investors with material information concerning Defendants' expectations for the launch and growth potential of Rytelo (imetelstat). Defendants' statements

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately February 28, 2024, to February 25, 2025; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

included, among other things, confidence in Geron's ability to capitalize on the purportedly significant unmet need for the drug and to execute on its commercial plan to target first-line ESA ineligible patients, while continually minimizing the risks associated with the burden of the weekly monitoring requirement for Rytelo and the impacts of seasonality and existing competition on the drug's sales.

3.    Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Rytelo's potential; notably, that the lack of awareness for Rytelo, the burden of the continued monitoring requirement, and the impacts of seasonality and existing competition which resulted in Geron's inability to capitalize on the purportedly significant unmet need for the drug, particularly among first-line patients and those outside the academic setting.

4.    On February 26, 2025, Geron announced its financial results for the fourth quarter of fiscal 2024, disclosing that Rytelo's growth had flattened over the preceding months. The Company attributed the diminished growth on seasonality, competition, lack of awareness for Rytelo, and the burden of the monitoring requirement necessary for the drug treatment.

5.    Investors and analysts reacted immediately to Geron's revelation. The price of Geron's common stock declined dramatically. From a closing market price of $2.37 per share on February 25, 2025, Geron's stock price fell to $1.61 per share on February 26, 2025, a decline of about 32.07% in the span of just a single day.

**JURISDICTION AND VENUE**

6.    This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

7.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

8.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

1

**THE PARTIES**

2    **A.    Plaintiff**

3    9.    Plaintiff has been a shareholder since prior to the Relevant Period, is currently, and at all

4    relevant times has been, a holder of Geron common stock.

5    **B.    Nominal Defendant**

6    10.    Nominal Defendant Geron is incorporated in Delaware and its current principal

7    executive offices are located at 919 East Hillsdale Blvd., Suite 250, Foster City, California 94404. The

8    Company's common stock trades on the Nasdaq Global Select Market (the "NASDAQ") under the

9    ticker symbol "GERN."

10   **C.    Defendants**

11   11.    Defendant John A. Scarlett ("Scarlett") was the President, Chairman, and Chief

12   Executive Officer (the "CEO") of the Company until March 11, 2025. Defendant Scarlett is named as

13   a defendant in the Related Securities Action.

14   12.    Defendant Andrew J. Grethlein ("Grethlein") has been the Company's Chief Operating

15   Officer (the "COO") since January 2019. Defendant Grethlein is named as a defendant in the Related

16   Securities Action.

17   13.    Defendant Michelle Robertson ("Robertson") has been the Company's Chief Financial

18   Officer (the "CFO") since September 2023. Defendant Robertson is named as a defendant in the

19   Related Securities Action.

20   14.    Defendant Faye Feller ("Feller") has been the Company's Chief Medical Officer (the

21   "CMO") since July 2022. Defendant Feller is named as a defendant in the Related Securities Action.

22   15.    Defendant Anil Kapur ("Kapur") was the Company's Corporate Strategy and Chief

23   Commercial Officer until August 31, 2024. Defendant Kapur is named as a defendant in the Related

24   Securities Action.

25   16.    Defendant Jim Ziegler ("Ziegler") has been the Company's Chief Commercial Officer

26   (the "CCO") since September 2024. Defendant Ziegler is named as a defendant in the Related

27   Securities Action.

28

17.    Defendants Scarlett, Grethlein, Robertson, Feller, Kapur, and Ziegler are collectively referred to herein as the "Securities Action Defendants."

18.    Defendant Dawn C. Bir ("Bir") has been the Company's Interim President and CEO since March 2025 and has been a member of the Company's Board of Directors (the "Board") since 2019.

19.    Defendant Gaurav Aggarwal ("Aggarwal") has been a member of the Board since 2023. Defendant Aggarwal is the Chair of the Strategic Committee and is a member of the Compensation Committee.

20.    Defendant V. Bryan Lawlis ("Lawlis") has been a member of the Board since 2012. Defendant Lawlis is the Chair of the Nominating and Governance Committee and a member of the Audit Committee.

21.    Defendant John F. McDonald ("McDonald") has been a member of the Board since 2022. Defendant McDonald is a member of the Strategic Committee and a member of the Audit Committee.

22.    Defendant Susan M. Molineaux ("Molineaux") has been a member of the Board since 2012. Defendant Molineaux is the Chair of the Compensation Committee and a member of the Nominating and Governance Committee.

23.    Defendant Elizabeth G. O'Farrell ("O'Farrell") has been a member of the Board since 2019. Defendant O'Farrell is the Chair of the Audit Committee and a member of the Strategic Committee.

24.    Defendant Robert J. Spiegel ("Spiegel") has been a member of the Board since 2010. Defendant Spiegel is a member of the Compensation Committee and a member of the Nominating and Governance Committee.

25.    Defendants Bir, Aggarwal, Lawlis, McDonald, Molineaux, O'Farrell, and Spiegel are collectively referred to herein as the "Director Defendants."

26.    The Director Defendants and the Securities Action Defendants are collectively referred to herein as the "Individual Defendants."

27.    The Individual Defendants along with Geron are referred to herein as the "Defendants."

**FIDUCIARY DUTIES ON THE INDIVIDUAL DEFENDANTS**

28.    By reason of their positions as officers, directors, and/or fiduciaries of Geron, and because of their ability to control the business and corporate affairs of Geron, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Geron in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Geron and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29.    Each director and officer of the Company owes to Geron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

30.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**<u>Duties of the Members of the Audit Committee</u>**

31.    Pursuant to the Audit Committee Charter of Geron (amended as of September 14, 2023)[2], the purpose of the Audit Committee is to:

> [O]versee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company. The Committee shall assist the Board in fulfilling its oversight responsibilities relating to: the integrity of the financial statements and other information provided by the Company to any governmental body, regulatory agency or the public; the Company's system of internal controls regarding finance, accounting, financial reporting and public disclosures; the Company's compliance with legal and regulatory requirements and with ethics policies that management and the Board have established; the qualifications, independence, and performance of the Company's independent registered public accounting firm ("independent auditors"); and the Company's accounting and financial reporting processes generally. Consistent with this function, the Committee encourages continuous

---

[2] Available at https://s201.q4cdn.com/710325604/files/doc_downloads/2023/09/updated-audit-committee-charter-sept-2023-clean-for-website.pdf.

improvement of the Company's policies, procedures and practices at all levels.

32. Concerning review of the Company's financial statements, the Audit Committee Charter states:

The Committee shall:

A.  Prior to dissemination to the public: (i) review with the CEO, CFO, and/or CLO the accuracy of the financial statements contained in SEC Forms 10-Q, Forms 10-K and associated press releases issued by the Company; (ii) review and discuss with the CEO, CFO, and/or CLO any material, proposed compliance-related disclosures in the Company's annual and quarterly financial statements; (iii) prior to the issuance of earnings or announcement of guidance, the Committee shall review and approve any such disclosure with the CEO, CFO and/or CLO to ensure that the proposed disclosure has a reasonable basis and that material risks and contingencies are properly disclosed; and (iv) discuss with the CEO, CFO and/or CLO any earnings guidance provided to analysts and rating agencies, and other reports or financial information submitted to any governmental body or the public in connection with such financial information, including any certification, report, opinion, or review rendered by the independent auditors.

B.  Review with the CEO, CFO and/or CLO and the independent auditors the financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Forms 10-K or Forms 10-Q prior to filing, including their judgment about the quality and acceptability of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures, and the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates. The Committee shall discuss the results of the annual audit or quarterly review and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards, including all critical audit matters ("CAMs") proposed by the independent auditor to be included in the independent auditor's annual audit report.

C.  Following completion of the annual audit, review separately with management and with the independent auditors any significant difficulties encountered during the audit, including any restrictions experienced by the independent auditors on the scope of their work or access to required information. Among the items that the Committee should consider reviewing with the independent auditors are: (i) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise); (ii) any communications between the independent auditors' audit team and their national office with respect to auditing or accounting issues encountered during the audit; and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company. The Committee shall obtain assurances

from the independent auditors that Section 10A(b) of the Exchange Act has not been implicated.

D.  Review any significant disagreement among management, non-management employees and the independent auditors in connection with the preparation of the Company's annual financial statements and any related disclosures.

E.  Based on (i) the review and discussion referred to in paragraph 2(B) above, (ii) the disclosure received from the independent auditors regarding its independence and discussions with the independent auditors regarding such independence pursuant to paragraph 1(D)(ii) above, and (iii) the discussions with the independent auditors pursuant to paragraph 1(F) above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

F.  Prepare a report to be included in the Company's annual proxy statement, as required by SEC regulations.

G.  Report the results of the annual audit to the Board. If requested by the Board, invite the independent auditors to attend the full Board meeting to assist in reporting the results of the annual audit or to answer other Board members' questions.

33.  Concerning review of disclosure matters, the Audit Committee Charter states:

The Committee shall:

A.  Monitor the Company's internal control over financial reporting and review any significant changes in its internal controls.

B.  Review any material weaknesses or significant deficiencies identified in internal control over financial reporting, as well as any remediation plan to address internal control deficiencies.

34.  Concerning review of compliance, the Audit Committee Charter states:

The Committee shall:

A.  Establish, review periodically and update as necessary a Code of Conduct (the "Code"), ensure that management has established a system to enforce the Code, and review management's monitoring of the Company's compliance with the Code.

B.  Review the adequacy of and management's implementation and monitoring of the Company's internal control over financial reporting to ensure that the Company's financial statements, reports and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

C.    Oversee the Company's Insider Trading Compliance Program (the "Program"), including approval of any material updates to the Program, and receive a report, at least once annually, from the Company's General Counsel as the Company's Insider Trading Compliance Officer (the "Compliance Officer") regarding his or her monitoring of the Program. The Committee shall have regular access to the Compliance Officer, including the opportunity to meet with the Compliance Officer outside of the presence of any other senior executives of the Company.

D.    Request assurances from management that the Company's foreign subsidiaries and foreign affiliated entities, if any, are in conformity with applicable legal requirements, including disclosure of related party transactions.

E.    Review with the Company's General Counsel any legal matters that could have a significant impact on the Company's financial statements.

F.    Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. In addition to the foregoing, the Chair of the Audit Committee will receive reports from an independent, third-party supplier engaged by the Company to provide and monitor a whistle-blower hot line for Company employees and consultants, such as the Nasdaq OMX Whistleblower Hotline. The Chair will ensure that all anonymous whistleblower complaints are provided to the Company's General Counsel and that all complaints are completely and fully investigated by the Company's General Counsel, or a designated senior-level employee, in consultation with the Audit Committee. The Company's General Counsel must report to the entire Board at least annually on the status of every whistleblower complaint, if any, received by the Company in the preceding 12-month period.

G.    Discuss with management any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process or accounting policies.

35.   Concerning risk assessment and management, the Audit Committee Charter states that the Committee shall "Discuss with management the Company's policies and procedures with respect to risk assessment and risk management."

36.    Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the members of the Company's Audit Committee.

### Duties Pursuant to the Company's Code of Business Conduct and Ethics

37.    The Individual Defendants, as officers and/or directors of Geron, were also bound by the Company's Code of Business Conduct and Ethics (the "Code")[3] which, according to the Code, sets out guiding principles to all directors, officers, and employees of Geron, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

38.    Regarding honest and ethical conduct, the Code states:

> It is the policy of GERON to promote high standards of integrity and ethics by conducting our affairs in an honest and ethical manner. The integrity and reputation of GERON depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity. It is GERON's expectation that all of its directors, officers and employees, wherever located and regardless of function, conduct all activities in accordance with high standards of integrity and ethics, and in compliance with the laws, regulations, and written directives in every country, as well as with this Code and all other corporate and governmental policies. This expectation extends to third parties with whom we may contract to conduct activities on our behalf.

39.    Regarding legal compliance, the Code states:

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to be familiar with and understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others prior to engaging in any conduct that may violate the Code. Therefore, every employee must not only abide by legal requirements but also with requirements in GERON'S policies and other documents. If you have a question related to compliance, it is important that you not hesitate to seek answers from your manager, an EMC member or the Compliance Representative.

---

[3]    Available at https://s201.q4cdn.com/710325604/files/Gov_Doc/2023/10/code-of-conduct-2022-final_updated.pdf.

Disregard or violation of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as GERON, to civil and/or criminal penalties. You should be aware that conduct and records, including emails and text messages, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations because compliance is everyone's responsibility. GERON'S management is available to advise and assist employees. Any questions or concerns about compliance should be brought without delay to your manager, an EMC member or the Compliance Representative, as appropriate. See Section 20 later in this Code for more information.

40.    Regarding insider trading, the Code states:

Employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about GERON or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when aware of material inside information, and must comply with GERON'S Insider Trading Compliance Program.

41.    Regarding maintenance of corporate records and public reporting, the Code states:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, service providers, creditors, employees and others with whom we do business. As a result, it is important that our documents, books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the United States Securities and Exchange Commission, or SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosures are accurate and transparent and that our reports contain all of the information about GERON that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Finance Department, as well as our independent registered public accounting firm and inside and outside legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his/her/their knowledge promptly to a supervisor, a member of the EMC, the Compliance Representative, the Audit Committee or one of the other compliance resources described in Section 20. or in accordance with the provisions of GERON'S Whistleblower Policy on Reporting Complaints Regarding Accounting and Auditing Matters, which permits anonymous reporting.

42.    Regarding compliance standards and procedures, the Code states:

To facilitate compliance with this Code, we have implemented a program of awareness, training and review. We believe that training increases awareness of a wide range of ethical and legal issues in the workplace, such as conflicts of interest, bribery and corruption, insider trading, data privacy, information security, diversity and inclusion and avoiding hostile work environments and puts these topics into relatable situations, reinforcing the message that rules and policies apply to all employees. As such, it is the

policy of GERON to provide training to its employees at the onset of employment and periodically thereafter to ensure a "culture of compliance" is maintained by everyone in every department. We have appointed a Compliance Representative to oversee compliance with this Code, and the Compliance Representative is a person to whom you can address any questions or concerns. The Compliance Representative is responsible for:

- investigating possible violations of this Code or any of GERON internal policies, procedures and practices;

- training new employees on this Code and on policies and procedures related to upholding its standards and obligations;

- conducting annual training sessions to refresh employees' familiarity with this Code and relevant policies and procedures related thereto;

- implementing a periodic internal auditing and monitoring program for corporate compliance;

- distributing copies of this Code annually to each employee with a reminder that each employee is responsible for reading, understanding and complying with this Code;

- updating this Code as needed and alerting employees to any updates, with appropriate approval of the EMC to reflect changes in the law, GERON operations and in recognized best practices, and to reflect GERON experience; and

- otherwise promoting a "culture of compliance" and an atmosphere of responsible and ethical conduct.

Your most immediate resource for any matter related to this Code is your supervisor. He/she/they may have the information you need or may be able to refer the question to another appropriate source. There may, however, be times when you prefer not to go to your supervisor. In these instances, you should feel free to discuss your concern with GERON'S Compliance Representative. If you are uncomfortable speaking with GERON'S Compliance Representative for any reason, please contact a member of the EMC. Of course, if your concern involves potential misconduct by another person and relates to questionable accounting or auditing matters under GERON's Whistleblower Policy for Reporting Complaints Regarding Accounting and Auditing Matters, you may report that violation anonymously as set forth in such policy, at https://www.whistleblowerservices.com/GERN.

GERON'S Whistleblower Hotline, an anonymous, toll-free help line at 1-855-662-0145, is also available to those who wish to ask questions about GERON policies, seek guidance on specific situations or report violations of this Code. You may call the toll-free number anonymously if you prefer as it is not equipped with caller identification, although if you make an anonymous call GERON will be unable to obtain follow-up

details from you that may be necessary to investigate the matter. Whether you identify yourself or remain anonymous, your contact with the Whistleblower Hotline will be kept strictly confidential to the extent reasonably possible within the objectives of the Code. The Chair of GERON'S Audit Committee and the Company's Chief Legal Officer receive notifications from the Whistleblower Hotline.

### *Clarifying Questions and Concerns; Reporting Possible Violations*

If you encounter a situation or are considering a course of action and its appropriateness is unclear, discuss the matter promptly with your supervisor or GERON'S Compliance Representative; even the appearance of impropriety can be very damaging and should be avoided.

If you are aware of a suspected or actual violation of this Code standards by others, you have a responsibility to report it. You are expected to promptly provide the Compliance Representative with a specific description of the violation that you believe has occurred, including any information you have about the persons involved and the time of the violation. Whether you choose to speak with your supervisor or GERON'S Compliance Representative, you should do so without fear of any form of retaliation. We will take prompt disciplinary action against any employee who retaliates against you, including termination of employment.

Supervisors must promptly report any complaints or observations of Code violations to GERON'S Compliance Representative. If you believe your supervisor has not taken appropriate action, you should contact GERON'S Compliance Representative directly. GERON'S Compliance Representative will investigate all reported possible Code violations promptly and with the highest degree of confidentiality that is possible under the specific circumstances. Neither you nor your supervisor may conduct any preliminary investigation, unless authorized to do so by the Compliance Representative. Your cooperation in the investigation will be expected. As needed, the Compliance Representative will consult with the Legal department, the Human Resources department, the EMC and/or the Audit Committee of the Board of Directors. It is our policy to employ a fair process by which to determine violations of the Code.

With respect to any complaints or observations of violations that may involve accounting, internal accounting controls and auditing concerns, under GERON's Whistleblower Policy for Reporting Complaints Regarding Accounting and Auditing Matters, the Compliance Representative shall promptly inform the Company's Chief Legal Officer and the Chair of the Audit Committee, and the Audit Committee shall be responsible for supervising and overseeing the inquiry and any investigation that is undertaken.

If any investigation indicates that a violation of the Code has probably occurred, we will take such action as we believe to be appropriate under the circumstances. If we determine that an employee is responsible for a Code violation, he or she will be subject to disciplinary action up to, and including, termination of employment and, in appropriate cases, civil action or referral for criminal prosecution. Appropriate action may also be taken to deter any future Code violations.

43.    Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

44.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Geron, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Geron.

45.    Because of their advisory, executive, managerial, and directorial positions with Geron, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Geron.

46.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Geron and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

47.    To discharge their duties, the officers and directors of Geron were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Geron were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Geron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Geron was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

48.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Geron and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Geron, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Geron, the absence of good faith on their part, and a reckless disregard for their duties to Geron and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Geron.

49.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

50.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Geron has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

53.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, and waste of corporate assets; and (b) disguise and misrepresent the Company's actual business and financial prospects.

54.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

**SUBSTANTIVE ALLEGATIONS**

**Background of the Company**

56.    Geron is a commercial-stage biopharmaceutical company with a focus on blood cancer. Geron's primary product is a telomerase inhibitor, imetelstat, which the Company sells under the brand name, Rytelo. It is designed to reduce the proliferation of malignant cells to permit the production of new healthy cells.

57.    Rytelo was approved by the FDA on June 6, 2024, for the treatment of adult patients with low to intermediate-1 risk myelodysplastic syndromes ("lower-risk MDS"), with transfusion-dependent ("TD") anemia requiring four or more red blood cell units over eight weeks or who have

not responded to or have lost response to or are otherwise ineligible for erythropoiesis- stimulating agents ("ESAs").

**Materially False and Misleading Statements During the Relevant Period**

58.    On February 28, 2024, Geron filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the year ended December 31, 2023 (the "2023 10-K"). In providing an overview of the Company's commercial plans for RYTELO, the 2023 10-K stated, in relevant part:

> If imetelstat is approved in lower-risk MDS for marketing by regulatory authorities, we plan to commercialize imetelstat ourselves in the U.S. ***Our U.S. launch strategy is designed to prepare imetelstat, the market and the company to ensure broad reimbursement and deliver a seamless customer experience to all stakeholders at launch. Several long-lead time activities have already been completed, such as securing a global trademark for the imetelstat brand name; finalizing third party logistics, our distribution network, and our patient support providers; and onboarding highly experienced commercial and medical affairs leadership teams. We continue to conduct pre-commercial preparations for the U.S., such as enhancing and/or establishing company processes and systems to support a potential commercial launch, refining our market research in lower risk MDS, engaging in marketing and commercial access/reimbursement preparatory efforts, and hiring our sales force, which we expect to occur in the first and second quarters of 2024. We continue to evaluate our strategy for the potential launch and commercialization of imetelstat in Europe.*** Based on our internal estimates of pricing and addressable patient populations in 2031 and if regulatory authorities approve imetelstat for marketing in lower-risk MDS and relapsed/refractory MF, we believe the potential combined total addressable market opportunity in the U.S. and Europe for imetelstat is approximately $7.0 billion, of which lower-risk MDS represents approximately $3.5 billion and relapsed/refractory MF represents approximately $3.5 billion.

(Emphasis added).

59.    That same day, Geron issued a press release announcing the Company's Q4 and full year 2023 financial results. The press release stated, in relevant part:

> Geron's progress and execution throughout 2023 has paved the way for a potentially transformational 2024, as we plan for the transition to becoming a commercial company," said [Defendant] Scarlett[.] "***We believe that we are in a strong position for value creation, based on our differentiated product candidate, the potential for significant commercial opportunities in transfusion-dependent, lower-risk MDS and relapsed/refractory MF, the excellence and experience of our employees, and the strength of our balance sheet to support a potential U.S. launch***."

(Emphasis added).

60.    Also on February 28, 2024, Geron hosted an earnings call with investors and analysts to discuss the Company's Q4 2023 results (the "Q4 2023 Earnings Call"). During the scripted portion of the Q4 2023 Earnings Call, Defendant Scarlett stated, in relevant part:

[W]e ended 2023 with a strong cash position of approximately $378 million, which based on our current plans and expected available resources, we expect will enable us to fund a potential successful launch in transfusion dependent low risk MDS in the US and fund our planned operations into the third quarter of 2025.

***We believe our differentiated product candidates, the very important commercial opportunities in transfusion dependent low risk MDS and relapse/refractory MF, the excellence and experience of our employees, and the financial resources to execute on our near-term milestones, puts us in a strong position for value creation***.

(Emphasis added).

61.    Also during the scripted portion of the Q4 2023 Earnings Call, Defendant Kapur stated, in relevant part:

Approximately 10% of lower risk MDS patients are not eligible for ESAs and represent a very high unmet need subgroup. RS-negative patients make up approximately 75% of lower risk MDS patients and are a population particularly vulnerable to poor clinical outcomes. There are no therapies indicated for the treatment of anemia in RS negative patients once they are relapsed or refractory to ESAs. RS positive patients make up approximately 25% of the lower-risk MDS patients, and most who are high-transfusion burden lack effective treatment options. These underserved subgroups are at a greater risk for disease progression and suboptimal survival and are in the need for more effective treatment options.

Moving on to an update on US launch preparations, with our PDUFA date just about 3.5 months away, we have completed multiple critical launch readiness activities and plan to be ready to launch imetelstat in the US market upon potential approval. Long lead time activities such as securing our global trademark on our brand name, manufacturing of commercial supply are now complete. In preparation of launch, we have also finalized our distribution network and our patient support providers. In addition, we have onboarded and fully integrated a highly experienced commercial and medical affairs team into Geron. We continue to transition Geron towards a commercial company with the integration and adoption of systems and processes to recognize and report revenues and the continued refinement of engagement plans with marketing, commercial access, payer and reimbursement stakeholders.

(Emphasis added).

62.    On March 14, 2024, Geron issued a press release entitled "Geron Announces FDA Oncologic Drugs Advisory Committee Votes in Favor of the Clinical Benefit/Risk Profile of

Imetelstat for the Treatment of Transfusion-Dependent Anemia in Patients with Lower-Risk MDS."

The press release stated, in relevant part:

> "We are pleased with the Committee's decision to recognize the positive clinical benefit/risk profile of imetelstat for the treatment of transfusion-dependent anemia in adult patients with lower-risk MDS. There are few treatment options and significant unmet medical need remains for these patients, particularly among those with difficult-to-treat subtypes of this blood cancer," said [Defendant] Feller[.] "*We believe that imetelstat has the potential to be an important new medicine for patients* and look forward to continuing our collaboration with the FDA as they complete their review of our New Drug Application."

(Emphasis added).

63.    On May 2, 2024, Geron issued a press release announcing the Company's Q1 2024 financial results. The press release stated, in relevant part:

> "Since the FDA ODAC's 12 to 2 vote in favor of the clinical benefit/risk profile of imetelstat for the treatment of transfusion-dependent anemia in patients with lower risk MDS in March, we have continued working with the FDA as they complete their review of our New Drug Application, which has a June 16, 2024 PDUFA target action date," said [Defendant] Scarlett[.] "*We are actively preparing for a successful launch of imetelstat in the U.S., if approved, including most recently onboarding our sales force last month, refining our market research and completing buildout of our enterprise capabilities and systems to support our transition from a clinical to commercial-stage company*."

> U.S. Commercial Preparation

> Geron has now completed onboarding its commercial team, with the buildout of the full sales organization in April. *Other commercial preparations for the U.S. are ongoing and on target, including enhancing and/or establishing company processes and systems to support an expected commercial launch, refining market research in TD LR-MDS, and engaging in marketing, commercial access, payer, and reimbursement preparatory efforts*.

(Emphasis added).

64.    That same day, Geron hosted an earnings call with investors and analysts to discuss the Company's Q1 2024 results (the "Q1 2024 Earnings Call"). During the scripted portion of the Q1 2024 Earnings Call, Defendant Scarlett stated, in relevant part:

> We're poised for a successful U.S. launch of Imetelstat for the treatment of transfusion-dependent anemia in patients with lower risk MDS. If approved we're deeply excited for the opportunity to bring patients what we believe is an important and differentiated

medicine. With our PDUFA date on June 16th, we continue to work closely with the FDA as they complete the review of our new drug application.

\*        \*        \*

In short, we're building on our momentum acting with urgency and fully confident in our readiness for U.S. launch on potential approval. We're also financially well resourced to support the planned U.S. commercial launch with approximately $465 million on the balance sheet as of March 31 of this year. On the heels of the highly positive ODAC outcome, we raised approximately $141 million in net proceeds from an underwritten public offering of common stock and a pre-funded warranty.

65.    Also during the scripted portion of the Q1 2024 Earnings Call, Defendant Kapur stated, in relevant part:

> ***We believe that we are positioned very well for commercial value creation and are well-prepared to execute a successful U.S. launch upon potential approval***. As [Defendant Scarlett] mentioned in April, we completed the build-out of our full commercial organization with the hiring of our sales force, which is being now integrated and trained so that they will be prepared to be deployed in the field upon potential approval.

\*        \*        \*

> ***To support our launch preparation and commercial strategy, we have collected extensive market insights which suggest that Imetelstat is highly differentiated in this transfusion-dependent low-risk MDS market. Our research has shown that medical and payer stakeholders are dissatisfied with available options in the low risk MDS space which we believe creates an opportunity for Imetelstat.***

\*        \*        \*

> We expect to see Imetelstat uptake across ESA ineligible, ESA failed, RS negative, and RS positive high transfusion burden patients. Based on our latest 2024 market research of 50 U.S.-based practicing hematologists across both community and academic settings, on the left-hand side of the slide, you can see that our market research suggests meaningful Imetelstat use in frontline ESA ineligible patients, especially those who are RS negative.

\*        \*        \*

> ***We believe we are well-positioned to capitalize on Imetelstat opportunity in transfusion-dependent low-risk MDS by building on the unique product profile and executing on the launch critical success factors that are driving our commercial plan***. From a prescriber's perspective, we have a few important goals that prescribers embrace the totality of clinical benefit achievable with Imetelstat and understand the efficacy profiles across MDS subgroups, including RS negative and high-transfusion burden patients.

(Emphasis added).

66.    On June 6, 2024, Geron issued a press release entitled "Geron Announces FDA Approval of RYTELO™ (imetelstat), a First-in-Class Telomerase Inhibitor, for the Treatment of Adult Patients with Lower-Risk MDS with Transfusion-Dependent Anemia." The press release stated, in relevant part:

> "*With the approval and availability of RYTELO, we believe eligible patients with lower-risk MDS can potentially experience meaningful clinical benefit, particularly the potential for greater than 24 weeks of freedom from the burden of red blood cell transfusions and symptomatic anemia," said [Defendant] Scarlett[.] "The approval of RYTELO as the first telomerase inhibitor is a testament to the power of our science and the passion of our people to innovate in the field of blood cancer*. As we celebrate today's momentous milestone, I would like to thank the patients and families, advocates, clinicians, study coordinators and site personnel, scientists, and Geron employees and collaborators past and present whose participation was integral to this achievement and to supporting our transformation into a commercial company."
>
> *        *        *
>
> IMPORTANT SAFETY INFORMATION
>
> WARNINGS AND PRECAUTIONS
>
> Thrombocytopenia
>
> RYTELO can cause thrombocytopenia based on laboratory values. In the clinical trial, new or worsening Grade 3 or 4 decreased platelets occurred in 65% of patients with MDS treated with RYTELO.
>
> Monitor patients with thrombocytopenia for bleeding. *Monitor complete blood cell counts prior to initiation of RYTELO, weekly for the first two cycles, prior to each cycle thereafter, and as clinically indicated*. Administer platelet transfusions as appropriate. Delay the next cycle and resume at the same or reduced dose, or discontinue as recommended.
>
> Neutropenia
>
> RYTELO can cause neutropenia based on laboratory values. In the clinical trial, new or worsening Grade 3 or 4 decreased neutrophils occurred in 72% of patients with MDS treated with RYTELO.
>
> Monitor patients with Grade 3 or 4 neutropenia for infections, including sepsis. *Monitor complete blood cell counts prior to initiation of RYTELO, weekly for the first two cycles, prior to each cycle thereafter, and as clinically indicated*. Administer growth

factors and anti-infective therapies for treatment or prophylaxis as appropriate. Delay the next cycle and resume at the same or reduced dose, or discontinue as recommended.

(Emphasis added).

67.    On June 7, 2024, Defendants conducted a special investor call to announce the FDA approval of Rytelo. As part of the announcement, Defendant Scarlett discussed Rytelo's recent FDA approval, stating, in pertinent part: detailed their expectations for Rytelo's performance on the market, stating, in pertinent part:

RYTELO is now the first and only FDA-approved telomerase inhibitor.

*        *        *

The approval of RYTELO, with lower-risk MDS, with transfusion-dependent anemia, broadly across ESA ineligible and ESA relapse and refractory subpopulations, regardless of ring sideroblast or RS status, has the potential to transform the treatment paradigm for these patients who remain in high unmet need despite currently available treatment options. Approximately 10% of lower-risk MDS patients are not eligible for ESAs and have very limited treatment options. RS-positive patients make up approximately 25% of lower-risk MDS patients, and we must continue to experience high transfusion burden despite available therapies.

***RS-negative patients make up approximately 75% of lower-risk MDS patients in our population particularly vulnerable to poor clinical outcomes. There are approximately 13,200 U.S. patients with lower-risk MDS who need treatment for symptomatic anemia.[4]*** We believe that RYTELO can become part of the standard of care and help address unmet need in lower-risk MDS patients with transfusion- dependent anemia who are ESA ineligible, ESA relapsed/refractory RS-negative and ESA relapsed/refractory RS-positive with high transfusion burden.

(Emphasis added).

68.    Defendant Kapur detailed Geron's expectations for Rytelo's performance on the market, pertinently adding the following:

***On this next slide, we believe RYTELO offers a compelling value proposition for stakeholders.*** Lower-risk MDS is a blood cancer that often progresses to require increasingly intensified management of key symptoms such as anemia and resulting fatigue. Many lower-risk MDS patients with symptomatic anemia frequently become red blood cell transfusion dependent, which has been shown to be associated with short- and long-term clinical consequences that reduce quality of life and survival. ***There is a high unmet treatment need for patients with lower- risk MDS as many progress and are not***

---

[4] All emphasis added unless otherwise stated.

*responding to current treatments, achieving a durable response or experiencing extended and continuous red blood cell transfusion independence.*

*         *         *

From our perspective, these guidelines reflect a lack of effective new treatment options, in particular, for those patients who are ESA ineligible high-transfusion burden patients and for RS negative lower-risk MDS patients who constitute an estimated 75% of this market. This is a need, we believe, RYTELO can powerfully address as a potential, durable treatment that can be used broadly across these MDS subtypes. We expect to see RYTELO uptake across ESA ineligible, ESA failed RS- negative and RS-positive high transfusion burden patients. Based on our latest market research, which was completed earlier this month, with 37 community and 20 academic U.S.-based practicing hematologist.

On the left-hand side of this slide, as you can see, our research suggests meaningful RYTELO use in frontline ESA-ineligible patients. The right-hand side of the slide shows the estimated second-line population, approximately 85% of which are expected to be ESA or luspatercept experience. *Our research suggests a broad use of RYTELO across the second line regardless of frontline therapy and particularly for RS-negative patients. Our research supports the significant unmet treatment needs for the low-risk MDS patient population, and we strongly believe that RYTELO can play a meaningful role for eligible low-risk MDS patients moving forward.*

*We plan to conduct a prioritized and targeted launch to a concentrated prescriber base of approximately 8,000 health care professionals. We also plan to cover approximately 2,200 targeted accounts and 70% of the patients are expected to be treated in the community setting with low-risk MDS.* As an infused product, RYTELO will be provider administered. Medicare is expected to be the predominant payer with approximately 84% of the patients falling under the Medicare umbrella.

(Emphasis added).

69.    During the question-and-answer portion of the call that followed, Defendants responded to multiple inquiries regarding how the company expected the launch to proceed during the following pertinent exchanges:

<Q: Tara A. Bancroft – TD Cowen – VP & Senior Equity Research Analyst> Congrats on the approval and the great label. Can you describe more about your expectations for the cadence of the launch? Like what are the lowest hanging fruits to address first? And will there be a bolus of initial patients, things like that?

<A: John A. Scarlett> Anil?

<A: Anil Kapur> Sure. Thank you for the question, Tara. I think boluses are hard, Tara, to define and quantify. *What I will say is, what's become very clear is we are launching in a sensitized market and this market is dissatisfied with current options.* As you say,

the patients who are probably at the highest requirement for new therapies include patients who are either RS-negative, which is a large patient population, patients who are high transfusion burden and patients who may have seen both ESAs and/or luspatercept and are looking for better treatment options. And I think we are going to see a mix of all of these patients. ***But in general, the unmet need within this market is very high, and RYTELO has differentiated data to address all of the subpopulations.***

\*        \*        \*

<Q: Craig for Corrine Johnson – Goldman Sachs - Analyst> . . . So to start us off here, the label indicates that the drug is indicated for patients who require 4 or more transfusions in 8 weeks. So what portion of the patients does this apply to?

<A: John A. Scarlett> Go ahead, Anil.

<A: Anil Kapur> Great question, Craig. So Craig, just to step back for a second. I just want to note again that low-risk MDS is a progressive disease and transfusion burden, as we have seen through all the clinical publications and real-world data, only continues to increase over time and continues to increase from one therapy to another.

Our research and also data that was published by Dr. Rami at ASH 2023 showed from the real-world data set, ***approximately 50% of the patients are high transfusion burdens, which are 4 or more. In addition, our research also indicates that transfusion burden, in the eyes of a physician, is a sliding scale, with many physicians, approximately 80% plus of the physicians we have gone to research with indicating even one or higher on a regular basis is not satisfactory to them. So we expect a vast majority of the patients who are transfusion burden to be provided access to RYTELO.*** In addition, the NCCN guidelines will help with our adoption as well. So I'll just stop here to see if I answered your question.

….

<Q: Kalpit R. Patel – B. Riley Securities, Inc. – Senior Biotech Analyst> Many congrats on the approval yesterday. As you sort of model out the launch for imetelstat, what are your expectations for the real world average number of cycles, considering that there are more RS-negative patients in the real world than in the clinical trial settings?

<A: Anil Kapur> So Kalpit, we have not provided that guidance. Our expectation is that duration of treatment across both RS-positive and RS-negative and for all the populations we spoke about is likely to be guided by the totality of clinical evidence and how the patient -- as we said, across the factors, which include achievement of transfusion independence, but also the clinical characteristics that we speak about that physicians monitor for patients, including what they are seeing for hemoglobin rises and how the patient is feeling and decreases in RBC transfusions.

So we will look at RYTELO, we expect RYTELO to behave in a similar way as well within this marketplace and provide more information when appropriate.

1

<Q: Kalpit R. Patel> Okay. And one more question maybe. Any thoughts on the weekly
monitoring requirements for the first 2 cycles and every cycle thereafter? How similar or
dissimilar is that from your clinical trial protocol? And does that weekly monitoring
impact a particular group of physicians, maybe community doctors? All I'm trying to ask
is how reasonable is it to do this for those types of doctors?

<A: Anil Kapur> Faye, do you want to go for it and I can add?

<A: Faye Feller> Yes. Yes. I can take that. Hi Kal. So it is consistent with what was done
on the Phase III IMerge study weekly for the first 2 cycles and then monthly prior to
dosing in order to manage any potential dose modifications. ***This is pretty standard
across 4 hematologists, I would say, as closer monitoring, especially in this patient
population, it's often merited regardless of what drug you're starting in the beginning
of treatment as a patient adjusts to the new treatment and the side effect profile, while
monthly before the infusions is pretty standard.***

I don't know, Anil, if you have anything to add.

<A: Anil Kapur> The only other thing I'll add is, Kalpit, to your question. We also
obviously shared our profile and the weekly monitoring is also consistent. ***Many of these
patients, as you know, are highly transfusion burden and they are coming to the clinics
once a week or at least more than once a month many, many times to get red blood cell
transfusion. So this has not been something that has been highlighted as a burden by
both community and the academic facilities.***

(Emphasis added).

70.    On July 23, 2024, Geron issued a press release to announce, "that Anil Kapur, Executive

Vice President, Corporate Strategy and Chief Commercial Officer, will depart the Company on

August 31, 2024, to pursue other interests."

71.    Defendant Scarlett commented on the release attesting to Defendant Kapur's

involvement in Rytelo's initial launch:

We are encouraged by the uptake of RYTELOTM we are seeing in the first month of
launch and by the positive feedback from customers and are confident that our seasoned
commercial leadership team will continue to drive this momentum going forward . . . We
thank Anil for his significant contributions to our business over the past five years,
particularly his strategic vision to define the potential market for RYTELO, his
articulation of its value proposition and his foundational leadership in building strong
commercial organization, which I believe has positioned Geron for long-term success.
We wish him the best in his future endeavors.

72.    On August 8, 2024, Defendants provided their second quarter fiscal year 2024 results.

Notably, this quarter was the first reported following Rytelo's FDA approval and covering the drug's

initial launch. During the corresponding earnings call, Defendant Scarlett began the prepared remarks and provided some early responses to the initial launch, stating in pertinent part:

> *It was just 8 weeks ago that FDA approved RYTELO, our branded name for imetelstat as the first and only telomerase. And it was just 6 weeks ago that RYTELO became commercially available in the U.S. With our strong commercial infrastructure in place at launch and the efficient mobilization of our field teams, we've seen encouraging early launch results.*
>
> *As of July 31, 60% of the top decile 1 to 4 accounts have been reached by our team across both community and academic settings. This has led to gratifying uptake. We estimate again as of July 31 that approximately 160 patients have received RYTELO, which is quite encouraging given the very early stage of this launch.* The enthusiastic reception for RYTELO that we've seen within the hematology community reinforces the unmet needs for lower-risk MDS patients with symptomatic transfusion-dependent anemia. *Many of our customers are passionate about getting access to RYTELO for their patients, and we've seen a strong push across the U.S. to add RYTELO to formularies, treatment pathways and EMRs, including in the community setting.*
>
> In addition, the MDS NCCN guidelines were updated this July 25 to include RYTELO as a category 1 and 2A treatment for lower-risk MDS patients. *That is, RYTELO is now designated for use in both RS positive and RS negative first-line ESA ineligible patients as well as in both RS positive and RS negative second- line patients regardless of prior first-line treatment. We believe that these favorable NCCN guidelines have put RYTELO in a strong competitive position.*
>
> \*     \*     \*
>
> With the introduction of RYTELO as a new therapeutic option, we're seeing increasing dialogue among hematologists, rethinking treatment approaches for eligible low-risk MDS patients with transfusion dependent anemia. Consequently, we believe that RYTELO can become part of the standard of care for both eligible first and second-line patients. As shown on this slide, from the approximately 13,200 U.S. patients with lower-risk MDS who need treatment for symptomatic anemia, approximately 1 in 10 are ESA ineligible due to serum EPO levels higher than 500 mU/mL.
>
> These first-line patients have limited treatment options. RS-positive patients make up approximately 25% of the lower-risk MDS patient population, many of whom continue to experience high transfusion burden despite available therapies. RS- negative patients make up approximately 75% of lower-risk MDS patient populations, many of whom are particularly vulnerable to poor clinical outcomes and have few other treatment options.

(Emphasis added).

73.    Defendant Grethlein continued the prepared remarks, providing, in pertinent part, expectations for the continued execution and growth of Rytelo by detailing the drug's awareness,

benefits of its inclusion on the NCCN guidelines, and success of the company's execution on the drug's launch so far:

> ***First, we are pleased with the early awareness of RYTELO among prescribers and payers. Based on our market research before FDA approval in May of 2024 of over 100 U.S. hematologists and oncologists, over 80% of those surveyed were aware of imetelstat.*** One in 3 surveyed physicians indicated familiarity with the clinical data and ***a majority of these physicians look favorably on the efficacy profile and mechanism of action***, which is especially important for a first-in-class treatment.

> Payers are expressing high levels of interest and already have a strong understanding of the RYTELO U.S. prescribing information and IMerge Phase 3 clinical data. From an operational perspective, both dosage strengths of RYTELO, the 188 mg vials and 47 mg vials were available in our distribution channel for customers to order from specialty distributors as of June 27, 2024.

> Our distribution network is fully activated with our specialty distributor network actively supporting customer demand across hospitals and community oncology clinics. Across the contiguous 48 states, RYTELO is available to HCPs within 24 to 48 hours from our specialty distribution networks. ***We also believe that RYTELO's inclusion in the updated NCCN guidelines has been important in spreading awareness among the prescriber community.***

> *   *   *

> ***We believe that the strong RYTELO value proposition, commercial foundation and the execution of our entire organization is driving encouraging early results over these first 6 weeks of launch.*** As we commented earlier, we estimate that as of July 31, 2024, approximately 160 patients have received RYTELO. This demand was generated in part by reaching approximately 60% of top decile 1 through 4 accounts and includes orders from roughly 115 unique accounts.

> We are seeing an encouraging range of customers ordering RYTELO in these early days from small community to large aggregator accounts with hospitals ranging from community, academic centers, teaching hospitals and large health systems. In July, we kicked off our national speakers program with the launch of our national broadcast event featuring medical experts, which garnered over 300 medical professional participants. These events are a critical component of our marketing strategy to make sure HCPs are aware of the new treatment option for their eligible patients.

(Emphasis added).

74.    Defendant Robertson discussed Geron's financial details. Regarding Rytelo's launch and growth potential, Defendant Robertson stated, in pertinent part:

Based on our current operating plans and assumptions, we believe that our existing cash, cash equivalents and marketable securities, together with our projected revenues from U.S. sales of RYTELO, will be sufficient to fund our projected operating requirements into the second quarter of 2026.

75.    On September 9, 2024, Geron issued a press release announcing, "the appointment of Jim Ziegler as Executive Vice President, Chief Commercial officer, effective today, September 9, 2024," after Defendant Kapur vacated the position at the end of August.

76.    The release highlighted that Defendant Ziegler was hired to "spearhead Geron's global commercial strategy and operations, lead the commercial organization and be responsible for driving growth of RYTELOTM."

77.    Defendant Scarlett added "Jim brings to Geron an impressive track record of operational excellence, having led multiple high performing teams through product launches. We are thrilled to welcome Jim at this critical time when RYTELO is commercially available in the U.S. and we are seeing encouraging uptake since its launch at the end of June 2024."

78.    Defendant Ziegler was also quoted in the press release, stating, in pertinent part, "Geron already has a strong commercial organization and infrastructure in place, and I look forward to partnering with the team to drive a successful U.S. launch and the commercial potential of RYTELO."

79.    On November 7, 2024, Defendants conducted an earnings call corresponding to their third quarter fiscal year 2024 results. During the call, Defendants Scarlett touted the early success of Rytelo, stating in pertinent part:

> *In our first full quarter on the market in the United States, we achieved $28.2 million in RYTELO net product revenue which exceeded our expectations.* The initial quarter of product revenue speaks to our execution as a commercial company as well as the high unmet need in lower risk MDS and the compelling value proposition of RYTELO for hematologists and patients. *This gives us confidence in future continued demand and momentum for RYTELO.*
>
> Our strong IP position underlies the long-term commercial value proposition for RYTELO. We believe this IP position, including specific claims and our patents covering the indication that's in our FDA label and buttressed by the FDA's grant of orphan drug exclusivity for lower-risk MDS into June of 2031, will provide exclusivity in the United States through August of 2037.
>
> *Today, our primary focus is on continuing to deliver on the initial success we achieved in the third quarter, getting RYTELO to more eligible lower-risk MDS patients and*

*maximizing our opportunity in the U.S. market.* In Europe, we believe that the CHMP review of our RYTELO marketing authorization application in lower-risk MDS could be completed in late 2024 or early 2025 with potential EU approval in the first half of 2025. Subject to receiving this approval, we're continuing to prepare for the potential launch of RYTELO in the EU and are planning to commercialize RYTELO in select EU markets beginning in 2026.

*        *        *

*In addition to this quarter's strong commercial performance, we were pleased to announce this morning a completion of both the synthetic royalty transaction and a debt financing transaction that together generated $250 million in gross proceeds. These transactions were comprised of $125 million capped synthetic royalty with Royalty Pharma and a $250 million committed senior secured debt facility with funds managed by Pharmakon Advisors, under which we've borrowed $125 million, allowing us to retire existing debt.*

*With this new debt facility, we also have access to an additional $125 million. We believe that the favorable terms we achieved in these transactions reflect the significant commercial potential of RYTELO and coming off a successful first quarter of commercial launch provide us with critical flexibility to fuel continued growth and investment in our future.* Michelle will provide more details on these transactions and on our Q3 results later on this call.

(Emphasis added).

80.    Defendant Ziegler similarly praised the Company's early success with the launch of Rytelo and went on to provide details as to the Company's expectations for Rytelo's continued growth, pertinently as follows:

As Chip highlighted, we achieved $28.2 million in RYTELO net product revenues in our first full quarter of U.S. sales. In the first few months of launch, *demand has increased month-over-month with Q3 performance exceeding our expectations. Demand from launch through Q3 has come from 388 ordering centers which represents approximately 45% of our key targeted accounts. This strong start reinforces the high unmet need in RYTELO's clinical profile in first-line ESA ineligible and second line plus lower-risk MDS.*

Our market research indicates treating physicians appreciate RYTELO's differentiated clinical profile in 24-week and 1 year red blood cell transfusion independent rates, median duration of red blood cell transfusion independence and hemoglobin rise. *We believe RYTELO's strong clinical data support broad utilization across treatment eligible patient subgroups in both community and academic settings.*

Patient access is also critical for adoption and uptake and we have achieved significant payer coverage since approval. Payers responsible for approximately 70% of U.S. covered lives have implemented medical coverage policies for RYTELO that are

consistent with its FDA label, clinical trials and/or NCCN guidelines. Additionally, our permanent J-code was issued in October 2024 and becomes effective on 1 January 2025. We believe the permanent J-code will streamline billing and reimbursement for centers treating patients with RYTELO.

*I also want to acknowledge questions from investors regarding the trajectory of weekly RYTELO sales as reflected in third-party claims data. We believe that while these claims data may reflect trends in demand that are directionally consistent with what we see internally, there are caveats around this data when we compare them to our own insights, including incomplete weekly data capture. Also, we remain in the early stages of launch and continue to expect week-to- week fluctuations regardless of the source of sales data.*

\*      \*      \*

*From our own internal demand sales data, so far, the RYTELO sales growth trajectory in the fourth quarter continues to be promising. Overall, we remain confident in our launch progress to date, continued demand for RYTELO, expected momentum into 2025 and the projected long-term growth of the brand.*

*Our #1 commercial priority is to deliver a strong U.S. launch. We are committed to keeping laser-focused on that objective.* We plan to leverage our U.S. launch experience to also prepare for commercialization in select EU countries in 2026 and beyond. Our goal in Europe is to optimize patient access and revenues for imetelstat in prioritized countries. As Chip mentioned, subject to receiving regulatory approval, we are preparing to commercialize RYTELO in select EU countries in 2026. This includes working with experienced third parties who can provide contracted services, including essential critical path activities such as reimbursement, HTA assessments, market access and distribution.

In summary, I want to acknowledge the dedicated cross-functional teams at Geron for all their hard work to ensure that eligible U.S. patients have broad and timely access to RYTELO. I am inspired by how we have remained focused during this time of transition and I am optimistic in the future. *We are very pleased with the strong demand for RYTELO across community and academic settings, favorable payer coverage policies and broad utilization across patient segments. These early launch dynamics reinforce our expectations for continued demand and promising growth.*

(Emphasis added).

81.     The above statements were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Geron's optimistic reports of Rytelo's launch success and potential growth fell short of reality; the impacts of seasonality, existing competition, and the burden of continued monitoring played a much more significant role in patient starts than Defendants had

implied. Moreover, Rytelo lacked the necessary awareness to penetrate the market, resulting in an inability for Geron to capitalize on the purportedly significant unmet need for the drug, particularly among first-line patients and those outside the academic setting.

**The Truth Emerges**

82.    FOn February 26, 2025, Defendants provided their fourth quarter, fiscal year 2024 results, announcing that Rytelo's growth had flattened. In pertinent part, Defendant Scarlett stated:

> From a financial perspective, we ended the year with a strong cash position of approximately $503 million, which we expect will enable us to reach profitability without additional financing, if our internal sales and operating expense expectations are met.

> However, ***despite achieving this revenue in the first 2 quarters of launch, we have observed flat revenue trends over the last few months.*** As many of you will recall, beginning a few months into launch, we changed our commercial and medical affairs leadership. Jim Ziegler, our Chief Commercial Officer; and Joe Eid, our EVP of R&D, will discuss their assessments and actions in more detail later in this call.

(Emphasis added).

83.    Defendant Ziegler reiterated the flatness observed in Rytelo's growth over the past few months and pertinently providing the following details regarding the setback:

> As described previously by Chip, we achieved $47.5 million in RYTELO net product revenues in the fourth quarter 2024. This demand for RYTELO was supported by strong payer access. Payers responsible for approximately 80% of the U.S. covered lives have implemented medical coverage policies for RYTELO, that are consistent with the FDA label, clinical trials and/or NCCN guidelines.

> ***New patient starts and duration of treatment are the key primary drivers of revenue.*** For duration of treatment, it is important to note that even the longest treated patients in the commercial setting are just hitting the median of approximately 8 months observed in the Phase III IMerge trial and our market research suggests the duration of treatment in commercial RYTELO patients treated to date appears consistent with that observed in IMerge.

> ***However, with respect to new patient starts, we have observed flatness over the past few months. Specifically, even though we see RYTELO being utilized across RS-negative and RS-positive first-line ESA ineligible, second-line ESA relapse refractory and third-line plus patients, the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations.***

*        *        *

We are also assessing other possible root causes for the flat revenue trends and have implemented or are in the process of implementing several changes such as scaling up our analytics capabilities, refining our segmentation and targeting and improving our promotional and sales force effectiveness, which we believe will help us more fully capture the significant commercial opportunity for RYTELO in lower-risk MDS, which I will speak to on the next slide.

As shown on Slide 8 in our earnings deck, we estimate that in 2025, the U.S. RYTELO total addressable lower-risk MDS patient population is approximately 15,400 patients and includes patients recommended in the NCCN guidelines. This includes approximately 3,400 first-line ESA ineligible patients, approximately 7,600 second line and 4,400 third-line plus patients with approximately 75% of patients with RS-negative and 25% of patients with RS-positive status.

As I mentioned, our efforts are particularly focused on the eligible RS-negative population where RYTELO is the only drug approved for ESA relapsed/refractory patients. Assuming the duration of treatment observed in IMerge and based on the current net price, ***there is potential to achieve blockbuster status by treating approximately 1/3 of the U.S. RYTELO, total addressable patients.***

(Emphasis added).

84.     During the question-and-answer portion of the call that followed, Defendants responded to multiple inquiries regarding the declining growth trajectory for Rytelo during the following pertinent exchanges:

<Q: Peter Richard Lawson – Barclays Bank PLC – Research Analyst> Maybe first question would just be around how we think about revenues, your commentary around flat revenues over the last few months. Whether you're seeing any week- over-week growth. And I've seen that comment kind of captures January and February. And then the other component would just be around how we think about 1Q revenues themselves, whether that's flat or growing versus 4Q, and then anything you can tell us around revenues and costs as we think about 2025?

<A: John A Scarlett> Thanks, Peter. I appreciate the question. So Jim will take this question, which obviously relates to both prior revenues and also for -- you had some questions about potential future revenues in the first quarter. So Jim?

<A: James Ziegler> ***Peter, so our revenues week-over-week have had some variability. But what I would say is our 4- and 8-week rolling averages underscore the flatness that I characterized on the call. And that flatness continued into the prior week leading up to this call.*** So it may be a little bit too early to make a full call on Q1 revenues, but I would characterize and reinforce what we said on the earnings call that ***the past couple of months have been relatively flat week-over- week in the 4- and 8-week averages.***

\*     \*     \*

<Q: Tara A. Bancroft – TD Cowen – VP & Senior Equity Research Analyst> So I was hoping you could give us maybe some more detail on the seasonality or patterns in general, not only that you're seeing with RYTELO, but it appears to be impacting MDS as a whole with luspatercept too. So I'm curious to get your thoughts on what's happening at a higher level in this indication? And then separately, maybe, Jim, if you could tell us more about the expected cadence of growth this year that we could see with your implemented changes that you suggested?

<A: John A Scarlett> No, go ahead, to detail on the seasonality and the expected cadence.

<A: James Ziegler> Great. So we have started -- or *we saw some seasonality beginning around the holidays, Thanksgiving more specifically. And there is some hesitancy in the market to start some of these products that require, in our case, some monitoring. So there was a little bit of a delay.*

I agree with you that as we looked at other products in this market, and ran correlations between our trends and others, there was a very high correlation. So it didn't just affect, RYTELO, it affected a primary product that's used in this space as well.

In terms of the expected cadence, it's really driven off of our business driver, right? We characterize the most important business driver for us is new patient starts. *As you know, with launch products, often start in later line, third line plus, which we characterized on this call as seeing that's where the majority of our use was, even though we saw earlier line, second line, first-line use.*

So it really depends on our effectiveness in driving market share, not just in third- line plus, but in earlier line, second line and first-line opportunities. *And our expectation is that as we increase our share of voice, our reach and frequency and together with medical affairs, increase education and awareness, we hope to see greater impact and use across all lines of therapy.* But it's not going to happen overnight. Share of voice and increasing the prescribing behaviors will take some time.

\*        \*        \*

<Q: Faisal Ali Khurshid – Leerink Partners LLC – Research Analyst> On the trends that you've been seeing, could you comment on like how much of that was an impact on new patient starts as opposed to like discontinuations or dose modifications and holidays? I guess, the reason for the question is even if you're starting mostly in third-line patient, like shouldn't you be kind of like adding patients at a consistent rate? And I guess like people are also wondering like the duration of therapy should still be longer than like the time you've been in the market in third line as well? Or is that not the way to think about it?

<A: James Ziegler> Faisal, no, I think the way you're thinking about it is exactly right. The primary drivers are new patient starts and duration of treatment. What I said on the call is that duration of treatment at this point, while still early in that, we're only

approaching the median duration of treatment in IMerge about right now. That does not appear to be issue based upon our own market research and KOL.

As you know, there isn't perfect data that we can cite only data that we triangulate around. But right now, at this point, we don't believe that duration of treatment is inconsistent with that seen in IMerge. ***And so we have seen some softness and it's related to new patient starts.***

I think the way to characterize it is we saw uptake and unmet need and the treatment was really with some of these early adopters who believe -- who understood and believed in the product and ***it's our obligation to really increase the reach and frequency, the share of voice amongst the majority of physicians who have yet to treat patients with RYTELO.***

\*      \*      \*

<Q: Gregory Allen Harrison – Scotiabank Global Banking and Markets – Analyst> What feedback are you getting from KOLs and other providers around why they're not using RYTELO as much in earlier lines of therapy? And are there any differences based on setting as far as academic versus community? It sounds like from your comments just now that the bulk may be in academic?

<A: John A. Scarlett> Thanks, Greg. I think the first message that I would share with you is that our MD and our KOL feedback that have used RYTELO, very simply can be summarized as RYTELO works. ***And we see that in our market research and our one-on-one engagements with the KOLs. I think the biggest opportunity for us is to really increase the reach and frequency, our education and awareness and share of voice especially as you point out with the community.***

I'll just give you a very simple mathematic equation. So if you think about the 15,400 patients that we characterize as treatment eligible and you divide that by the number of MDS treating physicians in the U.S. It only leads to a couple of patients on average that each one of these physicians have. So it's really important for us to make sure that we get out to as many of these physicians in a cost-effective way through our sales team, our medical affairs team, and our nonpersonal efforts to really increase the share of voice.

\*      \*      \*

<Q: Stephen Douglas Willey – Stifel Nicolaus & Company, Inc – Director> Okay. Then maybe just last question. I guess, is what is happening in the U.S., just given the flatness and the trajectory of new patient starts. And I know you're not looking to commercialize in Europe until 2026. But does that now kind of change the cadence of perhaps expansion plans outside of the U.S.? Do you need to get the U.S. on track and kind of growing in a new patient start direction before you embark on anything outside the United States?

<A: John A. Scarlett> Yes, Steve, it's Chip. I think that it would be very easy for us to put our hands on our hearts and say our #1, #2 and #3 focus is on the U.S., the U.S. -- getting the U.S. on track, new patient starts on track, appropriate utilization throughout

the areas of high unmet need. And we are absolutely taking care to look at a variety of different options and to start some of the prework for Europe. But I think it would be very, very easy to say that our 90-plus percent of our focus is on the U.S. right now.

*    *    *

<Q: Emily Claudia Bodnar – H.C. Wainwright & Co., LLC – Vice President & Senior Healthcare Analyst> I guess on the first one, in terms of new patient starts, are you mainly seeing prescribers who have already used RYTELO, kind of re- prescribe it to new patients? Or is it mostly coming from new prescribers, new centers?

*    *    *

<A: James Ziegler> Great. Thank you. ***On new patient starts, we're seeing repeat prescriptions amongst the early adopters largely at many of the academic medical centers. In the community, it's a little bit more diffused.*** So there, we're seeing more breadth than depth. But over time, as with other product launches, I expect that both breadth and depth will continue to grow, especially as physicians gain clinical experience and success with RYTELO.

*    *    *

<Q: Kalpit R. Patel – B. Riley Securities, Inc. – Senior Biotech Analyst> Maybe first on the flattening over the past few months. Can you comment on exactly which month you started to see flattening? Was it the beginning of this year? Or was it the beginning of fourth quarter last year?

<A: James Ziegler> Kalpit, it's Jim here. ***I would say based upon the rolling 4- and 8- week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward.*** We do see, as you know, in the weekly data, a lot of variability, which is why we incur more to the 4- and 8-week rolling averages.

*    *    *

<Q: Kalpit R. Patel> I think we've had that slide in the deck saying that there are 15,000-plus patients eligible potential $1 billion plus in net revenue. Do you still stand by that $1 billion plus number?

<A: James Ziegler> Yes. The bottom line is for physicians that have used RYTELO and based upon our KOL feedback as well as market research, RYTELO works. It's that simple. It's our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country, but we absolutely do believe in it.

I think our opportunity is to also drive market development and KOL development. As Joe highlighted, there's a significant opportunity for us to increase the awareness, therefore, leading to initial trial. Initial trial will lead to reinforce success and broader use. It will just take a little bit of time.

(Emphasis added).

85.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the June 7, 2024, July 23, 2024, August 8, 2024, September 9, 2024, and November 7, 2024, press releases and shareholder calls. In those statements, Defendants presented a very self-assured account of the launch success and the overall potential of Rytelo, as they continually praised their alleged growth, the significant unmet need for the drug, the impact of Rytelo being placed upon the NCCN guidelines, and the general awareness of Rytelo and its generic identity, imetelstat, while they continually minimized the risks associated with the burden of Rytelo's weekly monitoring requirement and the impacts of both seasonality and existing competition on the drug's sales.

86.    Investors and analysts reacted immediately to Geron's revelation. The price of Geron's common stock declined dramatically. From a closing market price of $2.37 per share on February 25, 2025, Geron's stock price fell to $1.61 per share on February 26, 2025, a decline of about 32.07% in the span of just a single day.

87.    A number of well-known analysts who had been following Geron lowered their stock ratings in response to Geron's disclosures. For example, H.C. Wainwright & Co, while downgrading the stock to a neutral rating, noting that

> "the company has noted an 8-week and 4-week trend showing flat revenues since the holiday season. The company announced a plan to shift its strategy, aimed at educating HCPs on Rytelo and expanding awareness of the therapy.
>
> *        *        *
>
> The company did not provide specific plans to address awareness aside from increased HCP education and the use of KOLs and medical conferences."

The analyst went on to highlight that the majority of prescriptions remain in the academic setting, stating,

> "the company has observed prescribers re-prescribing Rytelo to patients, though mostly in the academic setting and noted that the community setting prescriptions have been more diffused.
>
> *        *        *

In the 3Q24 earnings call, the company noted 65% of prescriptions are in the academic setting, which we expect is still likely the case."

The analyst also pointed to the lack of first line new patient starts and pointed to competition as a likely factor, stating, in pertinent part:

The company noted that majority of new patient starts have been in 3L low risk myelodysplastic syndrome (LR-MDS) patients, while *the company's commercial plan is to target 1L ESA ineligible and 2L ESA refractory patients, as per the label.* We note that 1L and 2L patients tend to have longer duration on therapy and are less pre-treated, increasing potential for long term use

*        *        *

We remind *that luspatercept was approved for 1L patients in 2023*, which maybe causing a shift in prescriber patters and treatment paradigm. *We believe some HCPs who are still using ESAs in 1L are likely then using luspatercept in 2L and then Rytelo in 3L*

*        *        *

*[We] believe 2024 could have been impacted by upfront demand which may not be representative of realistic growth rate for future quarters.*

(Emphasis added).

88.    Similarly, Barclays, in lowering their price target 56%, similarly highlighted "*Rytelo new patient start flatness* over the past few months (specifically 4- and 8-week rolling averages), with *seasonality impact* that started around the Thanksgiving holidays in 2024, and *some hesitancy around starting products that require monitoring*" (emphasis added). The Company further noted that "[c]ompetitive dynamics also appear to be a headwind, and the majority of new starts are coming from the 3L+LR-MDS setting, while second line starts have been lower than expectations."

89.    The fact that these analysts, and others, discussed Rytelo's flat performance and Geron's below-expectation projections for the drug suggest the public placed significant weight on Geron's prior statements regarding Rytelo's anticipated performance. The frequent, in-depth discussion of Geron's guidance confirms that Defendants' statements during the Relevant Period were material.

## DAMAGES TO THE COMPANY

90.    Geron has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, Geron has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.    costs incurred in compensation and benefits paid to Defendants that breached their fiduciary duties and violated federal securities laws;

b.    substantial loss of market capital;

c.    costs already incurred and to be incurred defending the Related Securities Action and;

d.    any fines or other liability resulting from the Company's violations of federal law.

91.    In addition, Geron's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

92.    The wrongdoing complained of herein has irreparably damaged Geron's corporate image and goodwill.  For at least the foreseeable future, Geron will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Geron's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

93.    Plaintiff brings this action derivatively in the right and for the benefit of Geron to redress injuries suffered, and to be suffered, by Geron as a direct result of violations of federal securities laws by the Defendants.  Geron is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

94.    The Board of Geron, at the time this action was commenced, consisted of Defendants Bir, Aggarwal, Lawlis, McDonald, Molineaux, O'Farrell, and Spiegel a total of seven (7) individuals.

95.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Geron Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

96.     Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

97.     Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Bir Because of**
**Her Principal Professional Occupation as the Company's Interim CEO and President**

98.     Defendant Bir joined the Company as a director in March 2019, and has served as Interim CEO and President since March 2025. Defendant Bir is also a member of the Board.  As such, it is reasonable to infer that due to the importance of the success of Rytelo to the Company's financial prospects, Defendant Bir would have been aware of the troubling facts regarding the product's ability to establish itself in the market, notably the lack of awareness, the burden of continued monitoring, and existing competition in the space. The Company does not claim that Defendant Bir is an independent director and because her primary source of income and primary employment is her employment as Interim President and CEO of Geron and her professional reputation is inextricably bound to his role at Geron Defendant Bir is incapable of acting independently and demand is futile upon her.

**Demand is Futile as to the Audit Committee Defendants**

99.     Demand is futile as to Defendants O'Farrell, Lawlis, and McDonald (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

100.   The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties of the Audit Committee are set forth herein, *supra*.

101.   Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

102.   The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning Rytelo's ability to launch and grow, specifically the challenges regarding lack of awareness, the burden of continued monitoring, and existing competition troubling the product's growth.  In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

### Demand is Futile as to the Director Defendants

103.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

104.   Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

105.   Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the

Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

106. Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I
### Against the Securities Action Defendants for
### Contribution Under Section 10(b) of the Exchange Act,
### Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act

107. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108. As a result of the conduct and events alleged above, Geron has been named as a defendant in the Related Securities Action brought on behalf of Geron shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

109. Federal law provides Geron with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Geron has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Geron to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

110. Accordingly, Plaintiff, on behalf of Geron, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Geron under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Geron.

111.   Geron claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

112.   Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects.  These statements were materially misleading to persons who purchased Geron securities during the Relevant Period.

113.   The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Geron securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

114.   The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

115.   The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

116.   When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of Geron, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

117.   Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Geron were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of Geron.

**Allegations Regarding the Securities Action Defendants as Control Persons**

118.  In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Geron in their roles as directors and/or employees.  Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

119.  The Securities Action Defendants were "controlling persons" of Geron within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action.  Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

120.  Plaintiff hereby derivatively claims such right of contribution on behalf of Geron.

## COUNT II

### Against the Individual Defendants for Breaches of Fiduciary Duty

121.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.  The Individual Defendants owed and owe Geron fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Geron the highest obligation of good faith, loyalty, and due care.

123.  The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Geron shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

124.  During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Geron to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Geron and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

125.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

126.   Plaintiff, on behalf of Geron, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

127.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.   By his wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Geron.

129.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Geron.

130.   Plaintiff, as a shareholder and representative of Geron, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

131.   Plaintiff, on behalf of Geron, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Waste of Corporate Assets**

132.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

134.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c)

incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

135.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

136.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of Geron and that Plaintiff is an adequate representative of the Company;

B.   Determining and awarding to Geron the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.   Directing Geron and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Geron and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1)   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2)   a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.   Determining and awarding to Geron exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.   Awarding Geron restitution from Defendants, and each of them;

F.  Awarding Geron Contribution from the Securities Action Defendants, and each of them;

G.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.  Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:      April 16, 2025                    **REICH RADCLIFFE & HOOVER LLP**


By: /s/ Adam T. Hoover
Adam T. Hoover

**LIFSHITZ LAW PLLC**

Joshua M. Lifshitz

Attorneys for Plaintiff